**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| In re<br><br>JENNIFER ANN COURNOYER<br><br>Debtor(s) | Case No. 26-15156-TBM<br>Chapter 7 |
| JARED WALTERS,<br>Chapter 7 Trustee,<br><br>Plaintiff,<br><br>v.<br><br>UNLOCK PARTNERSHIP SOLUTIONS INC.<br><br>Defendant. | Adv. Proc. No. |

## COMPLAINT

Jared Walters, Chapter 7 Trustee, by and through his counsel, The Johnson Law Firm, for his Complaint against Unlock Partnership Solutions Inc. ("Unlock"), states as follows:

## JURISDICTION AND VENUE

1. The Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) and (e).

2. This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(H), (K), and (O).

3. Venue in this district is proper under 28 U.S.C. § 1409(a).

4. This adversary proceeding is commenced pursuant to Rule 7001(a), (b), and (i) of the Federal Rules of Bankruptcy Procedure and Local Bankruptcy Rule 7001-1.

5. Plaintiff Jared Walters consents to entry of final orders or judgment by the bankruptcy court in this adversary proceeding.

## PARTIES AND STANDING

6. Plaintiff Jared Walters ("Trustee") is the duly appointed Chapter 7 trustee of the bankruptcy estate of Jennifer Ann Cournoyer, Case No. 26-15156-TBM.

7. Ms. Cournoyer filed for relief under Chapter 7 of the Bankruptcy Code on July 17, 2026 (the "Petition Date").

8. Ms. Cournoyer was a resident of Colorado at all times relevant to this Complaint and resides at 211 Appleby Street, Bailey, Park County, Colorado (the "Property"). The Property is a single-family home and is Ms. Cournoyer's principal dwelling.

9. Unlock is a Delaware corporation registered with the Colorado Secretary of State as a foreign corporation in good standing since November 30, 2020 (ID No. 20208038761), with a mailing address of 270 Madison Ave, Suite 702, New York, NY 10016. Unlock began operating in Colorado in 2021, offering consumers a product it calls a "home equity agreement" or "HEA."

10. The Trustee brings the First Claim for Relief under 11 U.S.C. §§ 544(b), 550, and 551, and the Second Claim for Relief as successor to claims of the Debtor that became property of the bankruptcy estate under 11 U.S.C. § 541(a).

## FACTUAL ALLEGATIONS

11. On or about November 16, 2023, Unlock and Ms. Cournoyer entered into an HEA transaction documented principally by a contract Unlock titles a "Forward Sale and Exchange Agreement" (the "Exchange Agreement") and by a "Performance Deed of Trust" recorded against the Property (the "Transaction"). A copy of the Exchange Agreement is attached hereto as **Exhibit A**, and a copy of the recorded Performance Deed of Trust is attached hereto as **Exhibit B**.

12. Under the Transaction, Unlock paid $119,742 (the "Investment Payment"), a sum Unlock's documents state as 19.01% — 19.006%, unrounded — of an agreed $630,000 starting home value. Applying a 2.20x "Exchange Rate," the Transaction entitles Unlock to be paid 41.81% — 41.814%, unrounded — of the Property's future value (the "Unlock Percentage") upon settlement, subject to a cap called the "Maximum Unlock Share."

13. In connection with the closing, Unlock issued an "Investment Closing Statement" dated November 13, 2023 (the "Closing Statement"), a copy of which is attached hereto as **Exhibit C**. Unlock deducted from the Investment Payment a $5,867.36 origination fee (4.9% of the Investment Payment) and third-party transaction expenses, and disbursed $13,171.07 in payoffs to third parties, including $8,214.32 to the client trust account of Nelson & Kennard, a debt-collection law firm, and $4,956.75 to a US Bank account. Net closing proceeds to Ms. Cournoyer were $98,936. The proceeds of the Transaction were used for personal, family, or household purposes.

14. The Transaction has a ten-year term, and settlement is mandatory. The Exchange Agreement provides: "You are required to settle the Unlock Agreement on or before the Expiration Date, through either a Permitted Sale or an Owner Buyout." Exchange Agreement § 5.1. If Ms. Cournoyer dies during the term, her estate "is required to settle the Unlock Agreement," with a settlement date no later than 180 days following the date of death. *Id.* § 4.4. The Closing Statement states: "You must settle your Agreement on or before the end of the 10-year term," and the Performance Deed of Trust recites an Expiration Date of November 15, 2033. Settlement of the Transaction requires payment to Unlock of the lesser of the Unlock Percentage applied to the Property's value and the Maximum Unlock Share.

15. The Maximum Unlock Share is calculated as the Investment Payment multiplied by (1 + 20.90%) raised to the power of elapsed term days divided by 365. Exchange Agreement § 10. That is, the amount payable to Unlock grows at a compounding annual rate of 20.90%, a rate the Transaction documents call the "Annualized Cost Limit." The Annualized Cost Limit is calculated exclusive of the origination fee.

16. The 20.90% Annualized Cost Limit has been the binding measure of the Transaction's cost from its inception. The Closing Statement's own "Annualized Cost" table displays an annualized cost of 20.9% in every scenario for ending terms of one, two, and three years — whether home prices fall 2% per year or rise 6% per year — and states: "Note how the 20.90% Annualized Cost Limit applies in earlier years." In every early-year scenario Unlock itself modeled, the Transaction's cost does not vary with the housing market at all; it is the 20.90% Annualized Cost Limit, compounding annually.

17. The arithmetic of Unlock's own Home Equity Agreement Statement for the Property dated June 30, 2026 (the "Homeowner Statement"), a copy of which is attached hereto as **Exhibit D**, confirms that the Annualized Cost Limit is not a hypothetical ceiling but the operative measure of the debt. That statement reports an "Unlock Share" of $196,953, which it defines as "[t]he estimated amount to settle your Unlock Agreement." By the statement's own terms, that figure is the lower of two measures: Unlock's percentage of the Property's current value, and the Maximum Unlock Share. The first measure did not produce it. Applying the 41.814% Unlock Percentage to the statement's own low estimate of the Property's value, $564,504, yields $236,042; applying it to the statement's high estimate of $689,950 yields $288,496. The second measure produced it exactly. From November 16, 2023 through June 30, 2026 is 957 days, and $119,742 multiplied by 1.209 raised to the power of 957 ÷ 365 is $196,952.50 — within one dollar of the figure Unlock reports. As of June 30, 2026, therefore, the amount Unlock states is required to settle the Transaction was determined not by the 41.814% Unlock Percentage applied to the Property's value, but by the 20.90% Annualized Cost Limit: the sum Unlock advanced, compounding at 20.90% per year.

18. Unlock's own Closing Statement describes the Transaction in the vocabulary of lending. It defines the Annualized Cost Limit as the "[m]aximum annualized cost of your Agreement per year from start to end, exclusive of the Origination Fee, expressed as a percentage rate." It invites the loan comparison: "To make it easier to compare to a loan it may be helpful to consider Annualized Cost under various scenarios and compare with an interest rate or APR." It discloses an 85% "Home Finance Limit," defined as the "[m]aximum amount of debt

and equity financing secured by your home," computed by adding Unlock's own share to the "Outstanding Balances of Mortgage Debt." And it warns that "[a]n uncured default could result in a loss of the property via foreclosure or conversion." The same document states: "This is not a loan. No interest is charged on the Investment Payment."

19. To secure the Transaction, Ms. Cournoyer executed, and her spouse Neal Louis Nathanson joined in, the "Performance Deed of Trust" dated November 16, 2023 and recorded November 22, 2023 at reception no. 806145 in the real property records of Park County, Colorado (the "Deed of Trust"), encumbering the Property. *See* **Exhibit B**. On its face, the Deed of Trust is also a security agreement and fixture filing under the Uniform Commercial Code.

20. By the Deed of Trust, Ms. Cournoyer conveys the Property to the Public Trustee of Park County "IN TRUST, WITH POWER OF SALE" — in the instrument's words, "to secure Owner's payment to Beneficiary of the Settlement Payment and the performance of the Obligations."

21. The Deed of Trust gives Unlock the complete toolkit of a secured lender: a thirty-day notice-and-cure regime; acceleration ("Beneficiary at its option may require immediate payment in full of all sums secured by this Performance Deed of Trust"); the power of sale, including sale of the Property at public auction at which Unlock may itself bid; an assignment of leases and rents; Article 9 secured-party remedies; and an attorneys' fee provision that reaches "fees and disbursements of in-house counsel" and fees incurred "in any bankruptcy case or insolvency proceeding."

22. The Deed of Trust also extracts waivers characteristic of loan documents: Ms. Cournoyer "waives all homestead rights and any exemptions under state or federal law, presently existing or hereinafter enacted," as well as rights of redemption, appraisement, and valuation.

23. Paragraph 2.b of the Deed of Trust states: "Owner shall not be obligated to repay any part of the Investment Payment; and therefore, such item shall not be included within the Obligations. The foregoing shall not, however, in any way limit any payment calculated and agreed by Owner to be paid pursuant to the Exchange Agreement." The second sentence gives up what the first sentence's label attempts: whatever the Transaction calls the Investment Payment, Ms. Cournoyer's obligation to pay Unlock the Settlement Payment — measured by the Investment Payment growing at up to 20.90% compounded annually — remains fully intact and fully secured.

24. The Exchange Agreement supplies the rest of the secured lender's toolkit. An "Event Of Default" includes, among many other things, Ms. Cournoyer's insolvency or bankruptcy and any delinquency on any obligation regarding the Property. Exchange Agreement § 16.1. Upon defaults involving misrepresentation or unauthorized transfer, Unlock may demand "the return of the Investment Payment" together with any amount by which the Settlement Payment exceeds it, plus attorney fees and costs (§ 17.5); upon any uncured default, Unlock in its discretion may "increase the Settlement Payment by an amount equal to ten percent (10%) of the Investment Payment" (§ 17.6); and Unlock may make "Protective Advances" that bear interest at 8% per annum (§ 17.13). A Colorado Appendix to the Exchange Agreement provides

that, upon Ms. Cournoyer's breach of any provision, Unlock may at its option declare as "Liquidated Damages" an amount equal to the full Settlement Payment together with all other monetary obligations owed to Unlock — acceleration, by another name. And the Exchange Agreement carries a schedule of administration fees, including $500 for processing a sale or buyout and an estimated $500 to $3,500 for administering an event of default. Exchange Agreement Ex. E.

25. The Exchange Agreement then attempts to contract out of the consumer credit laws altogether. Section 21.5, titled "Not A Loan," provides: "To the fullest extent possible, Unlock and Owner agree that the Unlock Agreement is not subject to any federal, state and/or local law concerning consumer credit, including, without limitation, usury ceilings, disclosures, and any other requirements, restrictions, limitations or prohibitions set forth in such laws," and insists that the Annualized Cost Limit "is not an annual percentage rate limit, but rather a limit on Unlock's investment return." The Colorado Uniform Consumer Credit Code, C.R.S. § 5-1-101 *et seq* (the "UCCC"), forecloses the attempt: "a consumer may not waive or agree to forego rights or benefits under this code." C.R.S. § 5-1-107(1). A lender's stipulation that its loan not be treated as one is not a defense; it is evidence that Unlock sought to avoid the statute's application to its product.

26. In *Oasis Legal Fin. Grp., LLC v. Coffman*, 2015 CO 63, ¶ 4, 361 P.3d 400, the Colorado Supreme Court held that whether a transaction is a "loan" under the UCCC is determined by the transaction's substance, not its form or its labels, and that an advance of money coupled with an obligation of repayment creates a debt even if the obligation is styled nonrecourse or its amount is nominally contingent.

27. The Transaction is in substance a loan: Unlock advanced $119,742 to Ms. Cournoyer, and she is obligated to pay Unlock the Settlement Payment, secured by a power-of-sale deed of trust on her home, no later than the end of the ten-year term. That the Settlement Payment is measured in part by the Property's value does not change its character. Under *Oasis*, the question is not whether every possible outcome produces repayment but whether the transaction creates a debt, and the Transaction creates one whose amount grows with the passage of time. Nor is repayment contingent in practice. In an Assurance of Discontinuance entered into with the Administrator of the UCCC (the "Administrator") effective June 22, 2026 (the "AOD"), it is recited that "[b]ased on the HEAs reviewed in Colorado that closed, Unlock was repaid 89% of the time."

28. Every dollar payable to Unlock above the $119,742 it advanced — the growth produced by the compounding 20.90% Annualized Cost Limit — together with the $5,867.36 origination fee, is a loan finance charge under the UCCC: a charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to the extension of credit. C.R.S. § 5-1-301(20)(a). Growth in a repayment obligation over time "is a finance charge and a hallmark of a consumer loan under the UCCC." *Oasis*, 2015 CO 63, ¶ 56.

29. The Transaction is a "consumer loan" under C.R.S. § 5-1-301(15): Unlock, a person regularly engaged in the business of making loans as alleged in paragraphs 9 and 37 above, made a loan to a natural person, the debt was incurred primarily for a personal, family, or

household purpose, a finance charge was made, and the debt is secured by an interest in land. The Transaction is not a "loan primarily secured by an interest in land" excluded by C.R.S. § 5-1-301(15)(c), because the rate of the finance charge exceeds twelve percent per year and the Deed of Trust is a junior lien that did not finance the acquisition of the dwelling. C.R.S. § 5-1-301(26)(a).

30. Because the rate of the loan finance charge — capped and, in the early years, fixed at 20.90% per year — exceeds twelve percent per year as determined according to the provisions on finance charges contained in C.R.S. § 5-2-201, the Transaction is a "supervised loan" as defined in C.R.S. § 5-1-301(47).

31. The Transaction is therefore a "consumer credit transaction" within the meaning of C.R.S. § 5-1-301(12), which defines that term to include a consumer loan. Unlock, which made the Transaction and to which the Settlement Payment is payable, is a "creditor" within the meaning of C.R.S. § 5-1-301(17). Ms. Cournoyer, a person other than an organization to whom credit was granted in that transaction, is the "consumer" within the meaning of C.R.S. § 5-1-301(10). The UCCC applies to the Transaction. Ms. Cournoyer was a resident of Colorado when she entered into the Transaction with a creditor that had solicited and advertised its HEA product in Colorado, so the Transaction was made in this state. C.R.S. § 5-1-201(1)(b). Independently, the Exchange Agreement provides that it is governed by the law of the state in which the Property is located, and the UCCC applies where the consumer is a resident of Colorado at the time of the transaction and the parties agree that Colorado law applies. C.R.S. § 5-1-201(7)(b).

32. C.R.S. § 5-2-301(1) provides that "[u]nless a person is a supervised financial organization or has first obtained a license from the administrator authorizing the person to make supervised loans, the person shall not engage in the business of . . . [m]aking supervised loans."

33. At all times relevant to this Complaint, including on November 16, 2023, Unlock was not a supervised financial organization and did not hold a supervised lender license issued by the Administrator.

34. In the AOD, Unlock agreed "to apply for all licenses required under the Colorado Uniform Consumer Credit Code, C.R.S. §§ 5-1-101 to 5-9-103 to operate in Colorado, including a supervised lender license under C.R.S. § 5-2-301, et seq., before resuming operations in Colorado."

35. On November 1, 2024, the Administrator sent Unlock a cease-and-desist letter asserting that the HEA is a loan under the UCCC and *Oasis*. Following receipt of the letter, Unlock stopped making new HEAs in Colorado.

36. The AOD further recites the Administrator's allegations that Unlock's HEAs are "consumer credit transactions" under Colorado law; that Unlock disclosed to consumers an "annualized cost" rather than an annual percentage rate, calculated without the 3% to 4.9% origination fee; and that Unlock did not make the disclosures required by the UCCC. In the AOD, Unlock agreed to comply with the rate cap in C.R.S. § 5-2-201, "including by counting the origination fee in the calculation of the loan finance charge on HEAs subject to the UCCC."

37. Under the AOD, Unlock agreed to pay $390,783 to 167 Colorado consumers whose HEAs had already settled. The AOD addresses separately the "Outstanding Transactions" — HEAs, like Ms. Cournoyer's, that had not yet settled. As to those, Unlock made no payment upon execution of the AOD. It agreed instead that, as each such transaction settles, it will perform the same calculation and "shall ensure that transactions that settle after the date of this AOD do not result in the consumer paying Unlock the equivalent of a loan finance charge that exceeds the limitations on loan finance charges set forth in C.R.S. § 5-2-201," with any resulting payment due within thirty days of the settlement date. Unlock has therefore agreed with the Administrator — whether or not the AOD constitutes an admission of liability — that the finance charge on an outstanding HEA such as Ms. Cournoyer's is subject to the loan finance charge limitations of the UCCC.

38. Notwithstanding the cease-and-desist letter and the AOD, Unlock continues to assert and accrue its charges against Ms. Cournoyer's account at the 20.90% compounding rate. Unlock issued the Homeowner Statement on June 30, 2026 — eight days after the AOD's Effective Date. It states the estimated amount to settle the Transaction as $196,953 — $77,211 above the Investment Payment after approximately thirty-one and one-half months — an amount that continues to grow by approximately $102 every day.

39. Unlock's violations were knowing, or at minimum reckless. *Oasis* was decided in 2015, six years before Unlock began operating in Colorado. Unlock's own Closing Statement demonstrates that it knew how to compute and disclose the annualized percentage cost of its product. Unlock Home Equity Solutions Inc. — which Unlock's own public licensing disclosure identifies, together with the Defendant, as a wholly-owned subsidiary of Unlock Technologies Inc. — holds Colorado Supervised Lender License No. SUP-L-00267901, a Colorado Mortgage Servicer License, and a Colorado Mortgage Company Registration. The Unlock enterprise knows how to obtain Colorado licenses when it chooses to.

40. At the closing of the Transaction, a portion of the Investment Payment was disbursed to the client trust account of a debt-collection law firm and to a US Bank account. Ms. Cournoyer was subject to third-party debt collection at the time of the Transaction.

41. On the Petition Date, creditors held unsecured claims against Ms. Cournoyer totaling $71,689, comprising a $2,355 priority tax claim of the Colorado Department of Revenue and $69,334 in nonpriority unsecured claims, per her Schedules E/F. Those claims include claims of Credit One Bank on accounts opened in April 2021, April 2022, and April 2023 ($1,891, $3,336, and $3,074 respectively), of Mission Lane on an account opened in July 2023 ($3,747), and of Plusfinance/CWS on an account opened in August 2023 ($3,090). Upon information and belief, one or more of Ms. Cournoyer's creditors hold claims that arose before November 16, 2023 and that remain unpaid.

42. At the time of the Transaction, Ms. Cournoyer was generally not paying her debts as they became due. Her debts were in third-party collection, and $13,171.07 of the Investment Payment was consumed at closing in payoffs to third parties, including $8,214.32 to the client trust account of Nelson & Kennard, a debt-collection law firm. See Exhibit C. Upon information

and belief, at the time of the Transaction and as a result of it, the sum of Ms. Cournoyer's debts was greater than all of her assets at a fair valuation: in exchange for net closing proceeds of $98,936, she conveyed an interest in the Property worth approximately $263,428 on the day of the Transaction and incurred a secured settlement obligation whose amount, by Unlock's own model, compounds at 20.90% per year, while the unsecured claims described above remained unpaid. Upon information and belief, the assets remaining to Ms. Cournoyer after the Transaction were unreasonably small in relation to her obligations, and she intended to incur, believed she would incur, or reasonably should have believed she would incur, debts beyond her ability to pay as they became due. She was insolvent at the time of the Transaction or became insolvent as a result of it, and she filed for bankruptcy relief less than three years later.

**FIRST CLAIM FOR RELIEF**
**(Avoidance and Preservation of Voidable Transfer — 11 U.S.C. §§ 544(b), 550, 551; C.R.S. §§ 38-8-105(1)(b), 38-8-106(1))**

43. The Trustee incorporates the foregoing paragraphs as if fully set forth herein.

44. The grant of the Deed of Trust on November 16, 2023, recorded November 22, 2023 (the "Transfer"), was a transfer of an interest of the Debtor in property — a lien, with power of sale, on the Debtor's home.

45. The Colorado Voidable Transactions Act, C.R.S. § 38-8-101 *et seq* (the "CVTA"), formerly known as the Colorado Uniform Fraudulent Transfer Act, renders the Transfer voidable. C.R.S. § 38-8-101. The 2025 amendments that gave article 8 that name apply by their terms to claims for relief filed on or after their August 6, 2025 effective date, and the CVTA applies to this Claim for Relief. See 2025 Colo. Sess. Laws ch. 57, § 12(2). To the extent the pre-amendment version of article 8, the Colorado Uniform Fraudulent Transfer Act, is held to govern transfers made before August 6, 2025, its operative provisions, C.R.S. §§ 38-8-103, 38-8-105(1)(b), 38-8-106(1), and 38-8-110(1)(b), are materially identical to those cited herein, and the Transfer is voidable under either.

46. The Debtor did not receive reasonably equivalent value in exchange for the Transfer. In exchange for at most $119,742 — of which Unlock kept $5,867.36 as its origination fee — the Debtor granted Unlock the right to be paid 41.814% of the Property's future value, an interest worth approximately $263,428 measured against the agreed $630,000 starting home value on the day of the Transaction, subject to the 20.90% compounding cap, and secured that right with a power-of-sale lien on her home. By the Transaction's own 2.20x Exchange Rate, the Debtor conveyed $2.20 of interest in her home's value for every $1.00 advanced. The Exchange Agreement's own Table of Key Terms describes the 2.20x Exchange Rate as "[t]he price of your Unlock Agreement."

47. The value the Debtor received is not measured by the $119,742 in cash alone. The question under the CVTA is whether that sum was reasonably equivalent to what the Debtor gave in exchange: a contractual right to 41.814% of the Property's future value, which Unlock itself priced at a 2.20x multiple of its advance; a mandatory settlement obligation whose amount grows at up to 20.90% compounded annually; and a power-of-sale lien on her home, carrying the

acceleration, default, fee, and waiver provisions described above, securing that obligation. Nor did Unlock assume meaningful downside risk in exchange. By Unlock's own Closing Statement, in every early-year scenario it modeled — including a housing market falling 2% per year — the amount payable to Unlock was the Investment Payment compounding at 20.90%; and Unlock recites in the AOD that, on its Colorado HEAs that closed, it was repaid 89% of the time.

48. The Transfer is voidable under C.R.S. § 38-8-105(1)(b): the Debtor made the Transfer without receiving reasonably equivalent value in exchange, and (I) her remaining assets were unreasonably small in relation to the Transaction, or (II) she intended to incur, believed she would incur, or reasonably should have believed she would incur, debts beyond her ability to pay as they became due.

49. In the alternative, the Transfer is voidable under C.R.S. § 38-8-106(1): the Debtor made the Transfer without receiving reasonably equivalent value at a time when she was insolvent, or she became insolvent as a result of the Transfer, and creditors whose claims arose before the Transfer — including the creditors identified above holding claims on accounts opened before November 16, 2023 — held and continue to hold claims against her. The Debtor was insolvent within the meaning of C.R.S. § 38-8-103(1) at the time of the Transfer or became insolvent as a result of it, as alleged in paragraph 42 above. Independently, because the Debtor was generally not paying her debts as they became due at the time of the Transfer — at the closing itself Unlock disbursed a portion of the Investment Payment to the client trust account of a debt-collection law firm — she is presumed insolvent under C.R.S. § 38-8-103(2).

50. On the Petition Date there existed, and there still exist, one or more creditors holding allowable unsecured claims against the Debtor who could avoid the Transfer under the CVTA. Under C.R.S. § 38-8-105, a creditor's claim may have arisen before or after the Transfer; under C.R.S. § 38-8-106(1), the creditors whose claims arose before the Transfer so qualify. The Trustee may therefore avoid the Transfer under 11 U.S.C. § 544(b).

51. This action is timely: it is brought within the periods of C.R.S. § 38-8-110 and 11 U.S.C. § 546(a).

52. The Trustee is entitled to avoidance of the Transfer in its entirety; to a determination that the Deed of Trust is avoided as against Unlock and that Unlock holds no lien on or other interest in the Property by virtue of the Deed of Trust; to preservation of the avoided Transfer for the benefit of the estate under 11 U.S.C. § 551; and, to the extent necessary, to recovery of the property transferred or its value from Unlock, the initial transferee, under 11 U.S.C. § 550(a).

WHEREFORE, Trustee respectfully requests that the Court enter judgment in his favor and against Unlock, (a) avoiding the Transfer pursuant to 11 U.S.C. § 544(b) and C.R.S. §§ 38-8-105(1)(b) and 38-8-106(1); (b) determining, pursuant to 28 U.S.C. § 157(b)(2)(K) and Fed. R. Bankr. P. 7001(b), that the Deed of Trust is avoided as against Unlock and that Unlock holds no lien on or other interest in the Property by virtue of the Deed of Trust; (c) preserving the avoided Transfer for the benefit of the estate pursuant to 11 U.S.C. § 551; (d) to the extent necessary,

authorizing recovery of the property transferred or its value from Unlock pursuant to 11 U.S.C. § 550(a); and (e) granting such other relief as the Court deems appropriate.

**SECOND CLAIM FOR RELIEF**
**(Unlicensed Supervised Loan — C.R.S. §§ 5-2-301, 5-5-201(1); 11 U.S.C. § 541)**

53. The Trustee incorporates the foregoing paragraphs as if fully set forth herein.

54. The Transaction is in substance a loan, a consumer loan, and a supervised loan under the UCCC.

55. By making the Transaction without a supervised lender license, and by engaging in the business of making supervised loans in Colorado without a license, Unlock violated C.R.S. § 5-2-301.

56. C.R.S. § 5-5-201(1) provides that where a creditor has violated the provisions of the UCCC on authority to make supervised loans contained in § 5-2-301, "the consumer is not obligated to pay the finance charge and has a right to recover from the person violating this code . . . a penalty in an amount determined by the court not in excess of three times the amount of the finance charge."

57. The Debtor's rights under C.R.S. § 5-5-201 became property of the bankruptcy estate under 11 U.S.C. § 541(a) on the Petition Date, and the Trustee is entitled to assert them for the benefit of the estate.

58. The loan finance charge of the Transaction includes the $5,867.36 origination fee and all accrued growth of the amount payable to Unlock above the $119,742 principal — $77,211 through June 30, 2026 per Unlock's own Homeowner Statement, and accruing daily. The finance charge accordingly totaled no less than $83,078 as of June 30, 2026 and continues to increase.

59. The Court should award the estate a penalty at or near the statutory maximum of three times the finance charge because the aggravating circumstances here include, without limitation, the following:

(a) Unlock launched its Colorado operations in 2021, six years after the Colorado Supreme Court decided *Oasis*;

(b) Unlock disclosed its product's cost as an annualized percentage rate and invited comparison to "an interest rate or APR" while withholding the disclosures, rate limitations, and licensure the UCCC requires of supervised lenders;

(c) Unlock continued to accrue its 20.90% compounding charge against Ms. Cournoyer's account after the Administrator's November 1, 2024 cease-and-desist letter and after the AOD, and continued to assert it in the Homeowner Statement it issued on June 30, 2026, eight days after the AOD's Effective Date; and

(d) Unlock agreed in the AOD that an outstanding HEA such as Ms. Cournoyer's must not result in a loan finance charge exceeding the limitations of C.R.S. §

5-2-201, yet it continues to state an amount required to settle the Transaction computed without regard to those limitations.

60. Under C.R.S. § 5-5-201(7), in any case in which it is found that a creditor has violated the UCCC, the court may award reasonable attorney fees incurred by the consumer. The Trustee requests such an award.

61. This claim is timely. With respect to a consumer credit transaction other than one made pursuant to a revolving credit account, C.R.S. § 5-5-201(1) permits an action to be brought until one year after the due date of the last scheduled payment of the agreement with respect to which the violation occurred. The Transaction's Expiration Date is November 15, 2033.

62. The Trustee is further entitled to a declaration that neither the Debtor nor the estate is obligated to pay any loan finance charge on the Transaction, and that any claim of Unlock arising from the Transaction is limited to no more than the unpaid principal of the Investment Payment, net of the $5,867.36 origination fee Unlock retained from it — that is, $113,874.64.

63. The Trustee is further entitled to a declaration that the Deed of Trust's attorneys' fee provisions are unenforceable under C.R.S. § 5-5-112, which caps attorney fees in a consumer credit transaction at fifteen percent of the unpaid debt after default and referral to "an attorney not a salaried employee of the creditor," and provides that "[a] provision in violation of this section is unenforceable." The Deed of Trust's uncapped fee provisions, which expressly extend to Unlock's in-house counsel, violate that section, as do the attorneys' fee provisions of the Exchange Agreement, including its default remedies (§ 17.2(d)), its prevailing-party injunction clause (§ 20.5), and its indemnification clause (§ 21.12).

WHEREFORE, Trustee respectfully requests that the Court enter judgment in his favor and against Unlock, (a) declaring that the Transaction is a supervised loan made without the license required by C.R.S. § 5-2-301; (b) declaring, pursuant to C.R.S. § 5-5-201(1), that neither the Debtor nor the estate is obligated to pay any loan finance charge on the Transaction and that any claim of Unlock arising from the Transaction is limited to no more than the unpaid principal of the Investment Payment, net of the $5,867.36 origination fee Unlock retained from it — that is, $113,874.64; (c) awarding the estate a penalty in an amount determined by the Court of up to three times the loan finance charge pursuant to C.R.S. § 5-5-201(1); (d) declaring the attorneys' fee provisions of the Deed of Trust and the Exchange Agreement unenforceable pursuant to C.R.S. § 5-5-112; (e) awarding the Trustee his reasonable attorney fees pursuant to C.R.S. § 5-5-201(7) and his costs; and (f) granting such other relief as the Court deems appropriate.

DATED September 4, 2026.

Respectfully submitted,

THE JOHNSON LAW FIRM

/s/ Lars Johnson
Lars Johnson, #34344
PO Box 10
Eagle, CO 81631
Phone: 970-688-0436
lars@johnsonlawbk.com
Attorneys for the Trustee